FILED
U.S. DISTRICT COURT
2006 MAR -1 A 10: 23
DISTRICT OF UTAH
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | MEMORANDUM DECISION |
| Plaintiff, | AND ORDER |
| vs. | **DENYING** DEFENDANT'S |
| | MOTION TO SUPPRESS |
| ELSA CONTRERAS, | |
| | Case No. 2:04-CR-716 W |
| Defendant. | |

This matter is before the court on Defendant's Motion to Suppress. On November 22, 2005, the court conducted an evidentiary hearing on the motion. Defendant Elsa Contreras ("Contreras") was present with her counsel, Roger Scowcroft. The government was represented by Veda M. Travis. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. After thorough review and consideration of the pleadings submitted by the parties as well as the evidence and testimony presented at the evidentiary hearing on the motion to suppress, the court enters the following memorandum decision and order.

## BACKGROUND

The court finds the relevant facts as follows.[1] Ryan Bauer is a sergeant with the Utah Highway Patrol. (Tr. at 6-7.) Prior to his promotion in November of 2005, Sergeant Bauer had

---

[1] Reference to the transcript of the evidentiary hearing conducted on November 22, 2005, will be cited as "Tr. at __."

served on the Highway Patrol for 14 years, the last four as a member of the Criminal Interdiction team. (Tr. at 7.) He has also served as a canine handler for the past seven years. (Tr. at 7.)

Sergeant Bauer has received hundreds of hours of specialized training in narcotics interdiction, including training as a drug recognition expert and training related to drug pipelines. (Tr. at 7-8.) During the pipeline classes, Bauer received training related to drug indicators and hidden compartments. (Tr. at 9.)

During his career, Sergeant Bauer has initiated approximately 100 traffic stops which have resulted in arrests for narcotics trafficking. (Tr. at 9.) He has also assisted other officers and troopers with approximately 50-80 pipeline cases. (Tr. at 9-10.)

On October 2, 2004, Sergeant Bauer was working on the Criminal Interdiction team as a trooper and K-9 handler. (Tr. at 10.) At approximately 1:00 p.m. he was driving southbound on Interstate 15 in Beaver County, Utah, when he observed a semi-truck traveling northbound with a tan, American-type car following behind. (Tr. at 10-11.) The car was approximately one to two car lengths behind the truck, a distance that Bauer did not consider safe. (Tr. at 11.) Under Utah law, vehicles may not follow other vehicles at an unsafe distance. (Tr. at 11.)

Sergeant Bauer made a U-turn and proceeded northbound where he pulled up on the left hand side of the tan car. (Tr. at 12.) Bauer observed one occupant, a female driver. (Tr. at 12.) The driver intently watched the trooper in her rearview mirror and did not appear to be watching the road. (Tr. at 13.) Bauer perceived her "intent" observation of him to be different than the average motorist in his experience. (Tr. at 13.) Sergeant Bauer noted that the vehicle was registered out of Minnesota. (Tr. at 13.)

Sergeant Bauer initiated a traffic stop on the vehicle, and approached on the passenger

side. (Tr. at 13-14.)[2] The driver, later identified as Elsa Contreras, rolled down the passenger window and Bauer made contact. Bauer advised Contreras as to why she had been stopped and asked for her driver's license, vehicle registration and proof of insurance. (Tr. at 14-15, 38; Govt's Ex. 1.)

As he was standing at the passenger window, Sergeant Bauer observed "signs of nervousness [that] were extreme." (Tr. at 15.) Bauer testified that Contreras displayed physical traits consistent with extreme nervousness. Contreras appeared pale and was shaking badly. (Tr. at 14.) As Contreras was looking for the requested documents, she opened the glove box and went through some papers. (Tr. at 15.) Bauer testified that Contreras' body was shaking so badly that she had a difficult time holding onto the paperwork. (Tr. at 15, 24.) When she did get hold of the documents, Bauer testified that he noticed the papers were shaking. (Tr. at 15.) Bauer acknowledged that the "average motorist" is nervous when pulled over by a police officer, but explained that the level of nervousness subsides after a few moments. Sergeant Bauer testified that in this case, the extreme nervousness "never did subside at all." (Tr. at 14-16, 18-19, 40.)

While Contreras was looking in the glove box, Bauer asked her about her trip. (Tr. at 16.) Contreras told Bauer that she was from Nebraska and had left Nebraska on or "about Thursday" to drive to Las Vegas. (Tr. at 16-17.) Contreras stated that the reason she had gone to Las Vegas was to visit a brother who lived there. (Tr. at 17.) She also told Bauer that another

---

[2]An audio/video recording of the incident was captured by a camera mounted in Sergeant Bauer's patrol car. Reference to this video will be cited as "Govt's Ex. 1." The defendant procured a transcript of the audio portion of the videotape, hereinafter referred to as "Def's Ex. A." The government submitted an edited version of Defendant's Exhibit A, hereinafter referred to as "Govt's Ex. 1A," which Sergeant Bauer had reviewed and edited.

3

relative from Mexico would also be there at the same time. (Tr. at 17.)

Contreras told Sergeant Bauer that she had arrived in Las Vegas, from Nebraska, that morning (Saturday, October 2). (Tr. at 17.) The traffic stop occurred at approximately 1:00 p.m. on Saturday afternoon. (Tr. at 17.) The location of the traffic stop was a three-hour drive from Las Vegas. (Tr. at 17-18.)

Bauer found Contreras' travel plans implausible. (Tr. at 18, 20-21.) He testified: "To have just arrived that morning, she could have only spent two or three hours at the most in Las Vegas to visit these relatives, especially the one that had come all the way from Mexico to visit her. It wasn't making sense at all to me." (Tr. at 18.) In addition, Bauer noted that Contreras interrupted him at times and provided more information than he requested. (Tr. at 18.) Bauer testified: "she [would] interrupt at times and start to explain a lot more about the trip than what I had asked for . . . to actually come out and visit relatives and that was the purpose for her trip." (Tr. at 18.)

Contreras provided Bauer with a Nebraska driver's license in the name of Elsa Contreras. (Tr. at 19, 38.) She also gave him an Avis rental agreement in the same name. (Tr. at 19.) The agreement indicated that the car had been rented out of Bellevue, Nebraska, on Thursday, September 30, 2004, and was not due back until Monday, October 4. (Tr. at 20.)

Sergeant Bauer testified that in his experience drug traffickers often use vehicles that are registered to third parties. (Tr. at 21.) A rental car is a third-party vehicle. (Tr. at 21.)

Based on Contreras' conduct, the third-party vehicle, and the implausible travel plans, Sergeant Bauer, given his training and experience, suspected that Contreras was involved in narcotics trafficking. (Tr. at 21.)

4

Sergeant Bauer told Contreras that he would not issue her a citation for following too close, and he explained the importance of giving more distance between vehicles, especially semi trucks. (Tr. at 22.) He returned all of her documents and said "something like have a nice day, drive safely . . ." (Tr. at 22, 40.) Contreras said "okay, thank you." (Tr. at 22.)

Sergeant Bauer stepped back briefly and then asked Contreras, "you wouldn't mind opening your trunk real quick before I let you go?" Contreras indicated that it was okay for Sergeant Bauer to look in the trunk. (Tr. at 23.) Contreras then began looking around the vehicle in an apparent attempt to try and open the trunk from the passenger compartment. (Tr. at 23; Govt's Ex. 1 at 11:53.) Sergeant Bauer pointed out the appropriate button, and Contreras opened the trunk. (Tr. at 23.) Sergeant Bauer testified that he asked for permission to look in the trunk in order to confirm or alleviate the suspicions he had about drug trafficking. (Tr. at 23.)

Sergeant Bauer walked to the trunk and looked inside. He observed a small piece of luggage and a plastic food bag, containing food, from a restaurant with a list of locations which were all in California. None of the locations were in Nevada. (Tr. at 24.) Bauer suspected that Contreras had been in California. (Tr. at 24.) During his initial look inside the trunk, Sergeant Bauer moved some items around and unzipped a bag. However, Bauer did not locate anything in the bag and he did not remove any items from the trunk at this time. (Govt's Ex. 1 at 11:53.)

While looking in the trunk, Sergeant Bauer noticed that the spare tire, which was located in a compartment covered with a carpeted lid, was not sitting flush with the trunk as it should be. (Tr. at 24, 51.) Because the carpeted cover did not fit appropriately, there was an opening through which Bauer could see the spare tire. (Tr. at 24, 51.) Sergeant Bauer noticed that the tire was too big for the area and was larger than it should be. (Tr. at 24.)

Sergeant Bauer then walked back to Contreras, told her that the spare tire was too large, and asked if she'd had the spare tire out. (Tr. at 25, 51; Govt's Ex. 1 at 11:53.) Contreras told Bauer that while she was in Las Vegas, she had taken the spare tire into the rental company because the other one was low on air. (Tr. at 25-26; Govt's Ex. 1A at 4.) Sergeant Bauer then asked, "do you mind if I just check the spare tire real quick? Because it's not fitting in there correctly, and I'm pretty sure . . . . " (Govt's Ex. 1A at 5.) Ms. Contreras interrupted and said, "They told me it wasn't going to fit in there, and I'm like, okay, I said, 'that's fine.'" (Govt's Ex. 1A at 5.) It seemed implausible to Sergeant Bauer that a rental company would replace a tire that was low on air with a tire that did not fit. Moreover, Bauer found the explanation inconsistent with her previously explained travel plans. Given the limited amount of time Contreras claimed to have been in Las Vegas, he thought it unlikely that she spent that time at the rental agency rather than visiting her relatives. (Tr. at 26.)

Sergeant Bauer asked again, "do you mind if I just check it real quick?" Contreras agreed. (Tr. at 25, 27, 51.) Bauer walked back to the trunk again and took the cover off the spare. (Tr. at 27, 51.) Bauer confirmed that the spare was too large for the spare tire space in the vehicle. (Tr. at 27.) Bauer then compared the tires that were on the vehicle and confirmed that the spare would not fit the vehicle. (Tr. at 27.) He then lifted the spare and noted that it felt heavier than it should. (Tr. at 27.) Bauer tapped on the tire and noticed that there was an oil-type substance leaking from the valve stem. (Tr. at 27-28, 51.) Bauer believed the tire contained something other than air. (Tr. at 27-28.)

Sergeant Bauer again approached Contreras and told her that he was going to get a tool to conduct a test on the tire. (Govt's Ex. 1 at 11:56.) Bauer explained that there was oil coming

from the tire. He confronted Contreras saying, "You didn't pick that tire up in Vegas did you?" (Tr. at 28; Govt's Ex. 1; Govt's Ex. 1A at 5.). Contreras admitted she had not.

Sergeant Bauer asked Contreras if there were narcotics in the spare tire. (Tr. at 28.) Contreras said there were not. (Tr. at 28.) Bauer asked if Contreras would mind if he took a couple of minutes to conduct a test on the tire. (Tr. at 28-29, 51; Govt's Ex. 1 at 11:56-57.) Contreras agreed to the test. Using a stethoscope and large wrench, Sergeant Bauer conducted an "echo test" on the tire. (Tr. at 29-30.) The test indicated that there was something other than air in the tire. (Tr. at 30.)

Sergeant Bauer told Ms. Contreras that he suspected the tire contained drugs and asked if she would accompany him to a service station where the tire could be examined. (Tr. at 30-31.) Contreras asked, "do I have to?" (Tr. at 52.) Bauer responded saying, "It's up to you. I think there is something in the tire, though, because that's what it sounds like to me." Contreras interrupted saying, "I don't think there is." (Govt's Ex. 1A at 6).

Contreras told Sergeant Bauer that she needed to back at work at 5:00 a.m. the next morning. (Tr. at 55-56; Govt's Ex. 1A at 6-7.) Contreras then said, "Yeah, I mean if it is necessary, I'll do it." (Def's Ex. A at 7.) Bauer stated, "I think there's something in the tire." (Def's Ex. A at 7.) Contreras then said, "If there isn't a real need for it . . . ." to which Bauer said, "I think there's something in the tire. I really do." (Def's Ex. A at 7.) Contreras then stated, "Okay." (Govt's Ex. 1A at 7.) Contreras then followed Bauer to a service station where the tire was broken down. (Tr. at 30-31.) Inside, Bauer located seven packages of methamphetamine. (Tr. at 31.)

DISCUSSION

A routine traffic stop is a seizure within the meaning of the Fourth Amendment. United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995), cert. denied, 518 U.S. 1007 (1996). It is well established that the reasonableness of a traffic stop is analyzed under a two-prong analysis set forth in Terry v. Ohio, 392 U.S. 1, 20 (1968). Under that analysis, the court must make a dual inquiry asking first whether the stop was justified at its inception, and second, whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." Id.; United States v. Williams, 271 F.3d 1262, 1266 (10th Cir. 2001), cert. denied, 535 U.S. 1019 (2002).

I.   Validity of the Initial Stop

A traffic stop "is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" United States v. Ramstadt, 308 F.3d 1139, 1144 (10th Cir. 2002) (quoting United States v. Ozbirn, 189 F.3d 1194, 1197 (10th Cir. 1999)). In the present case, it is uncontroverted that Sgt. Bauer saw Ms. Contreras' vehicle following a semitruck too closely, in violation of Utah law.[3] Accordingly, the stop was justified at its inception.

Having determined that the traffic stop was justified at its inception, the court must ask "whether the officer's actions during the detention were reasonably related in scope to the

---

[3]Utah law provides that the operator of a vehicle may not follow another vehicle more closely than is reasonable and prudent in light of the speed of the vehicles, the traffic and the condition of the highway. Utah Code Ann. § 41-6a-711.

8

circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. The Supreme Court has made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." Florida v. Royer, 460 U.S. 491, 500 (1983).

In addressing this second prong, the Tenth Circuit has recognized that an officer conducting a routine traffic stop may run computer checks on: (1) the driver's license, (2) the vehicle registration, (3) other proof of authorization to operate the vehicle, (4) outstanding warrants on the driver, and (5) whether the vehicle has been reported stolen. United States v. Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997); see United States v. Taverna, 348 F.3d 873, 877 (10th Cir. 2003). An officer may detain the driver and vehicle as long as reasonably necessary to make these determinations or to issue a citation or warning. Mendez, 118 F.3d at 1429. Once these computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning. United States v. Anderson, 114 F.3d 1059, 1063-64 (10th Cir. 1997).

Consistent with these established guidelines, Sgt. Bauer did not impermissibly detain Ms. Contreras or exceed the scope of the stop. An as initial matter, the record establishes that Contreras was detained for only a few minutes before Sgt. Bauer returned her documents and gave her a verbal warning for following too closely. (Govt's Ex. 1 at 11:50-11:53.) Moreover, the evidence shows that during those minutes, Sgt. Bauer checked out the rental car agreement and, on the basis of that agreement, spoke with Ms. Contreras briefly about where she had been. Sgt. Bauer's review of the rental agreement and his inquiry into her travel plans were reasonable

under the circumstances as the Tenth Circuit has explicitly provided that "questions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of the traffic stop." United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000) (citing United States v. Hernandez, 93 F.3d 1493, 1499 (10th Cir. 1996)). Therefore, the brief detention was reasonable.

II. Validity of the Detention Following the Initial Stop

Thereafter, Sergeant Bauer continued to speak with Ms. Contreras and asked if he could look in the trunk of her renal car. Under the established case law, Sgt. Bauer's conduct would not have violated the Fourth Amendment if (1) during the course of the traffic stop Sgt. Bauer acquired an objectively reasonable and articulable suspicion that the driver was engaged in criminal activity, or (2) the driver voluntarily consented to Sgt. Bauer's additional questioning. United States v. Patten, 183 F.3d 1190, 1193 (10th Cir. 1999). Although the government makes the argument that the prolonged encounter in this case was consensual,[4] the court need not address this argument because it is the opinion of the court that Sergeant Bauer had reasonable suspicion that Contreras was involved in criminal activity. See United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir.) ("An investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires a reasonable suspicion of

---

[4] The government asserts that the additional questioning which prolonged the encounter in this case was consensual. After issuing the verbal warning, Sgt. Bauer returned all of Ms. Contreras' documents and said "something like have a nice day, drive safely . . ." (Tr. at 22, 40.) Sgt. Bauer then stepped back briefly and then asked Contreras, "you wouldn't mind opening your trunk real quick before I let you go would you?" (Govt's Ex. 1.) It is the government's position that Contreras heard only "you wouldn't mind opening your trunk real quick . . ." because she interrupted Bauer at that point and spoke over the remainder of his sentence saying "Oh, no problem, go ahead."

10

criminal activity."), cert. denied, 522 U.S. 926 (1997).

In reaching this conclusion, the court has carefully reviewed and applied the standards governing reasonable suspicion of criminal activity. In making such a determination, deference is given "to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." Mendez, 118 F.3d at 1431. In developing reasonable suspicion, an officer is allowed "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002). Moreover, it is not appropriate for courts to "pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious. Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer, justified a brief roadside detention." United States v. Doyle, 129 F.3d 1372, 1376 (10th Cir. 1997). As such, factors that are not proof of any illegal conduct may be, when taken together in the aggregate, sufficient to amount to reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 9 (1989); see Arvizu, 534 U.S. at 277 (finding that factors susceptible to innocent explanation may, when taken together, form reasonable suspicion of criminal activity). Finally, whether an officer could have formed a reasonable and articulable suspicion of criminal activity is not based on any one factor, but rather, on the "totality of the circumstances." United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995).

In this case, Sgt. Bauer testified that based on the events that unfolded before him, he became suspicious that Contreras was trafficking in narcotics. Sergeant Bauer testified that from the outset, even prior to the stop, he noticed that Contreras was watching him very intently.

11

Seargent Bauer stated that Contreras' conduct in this regard was different from the average motorist and he found it unusual. See Unitd States v. McRae, 81 F.3d 1528, 1535 (10th Cir. 1996) (concluding that the district court did not err in finding that defendant's "unusual behavior" in "intensely watch[ing] the officer" properly contributed to the experienced officer's articulable suspicion of criminal activity).

Similarly, Sgt. Bauer testified that Contreras was extremely nervous throughout the traffic stop. The Tenth Circuit has cautioned that nervousness is of "limited significance" in determining whether reasonable suspicion exists. See United States v. Wald, 216 F.3d 1222, 1227 (10th Cir. 2000). However, "extreme and continued nervousness is entitled to somewhat more weight." United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001) (quoting United States v. West, 219 F.3d 1171, 1179 (10th Cir. 2000)). In this case, Sergeant Bauer testified that Contreras displayed physical indicators of nervousness, including visible shaking and a pale appearance. In addition, Sergeant Bauer stated that Contreras was overly talkative, which he perceived as a sign of her extreme nervousness. Careful review of the videotape confirms some of Sgt. Bauer's observations. For example, Contreras repeatedly interrupted Sergeant Bauer, spoke very quickly, and often provided information beyond that requested.

Moreover, although acknowledging that most motorists exhibit some degree of nervousness when approached by an officer, Sergeant Bauer testified that in his experience, Contreras' nervousness was more acute than that of the average motorist. In addition, Sergeant Bauer testified that in routine traffic stops, during the course of conversation, the nervousness subsides. Sergeant Bauer testified that in this case, Ms. Contreras' nervousness did not subside, and her nervous behavior was consistent with someone who may be involved in criminal activity.

(Tr. at 15-16.) Such extreme nervousness can support a finding of reasonable suspicion. See United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001) (upholding district court's finding that defendant's nervousness "exceeded that of the average citizen during a routine traffic stop" because defendant's nervousness "did not dissipate throughout the entire stop"); United States v. West, 219 F.3d 1171, 1179 (10th Cir. 2000); see also United States v. Soto, 988 F.2d 1548, 1556 & n.4 (10th Cir. 1993) (providing that extreme nervousness, when combined with other factors, can be a basis for reasonable suspicion).

Also of significance, Contreras did not own the vehicle she was driving, and it was a rental car. Sergeant Bauer testified that he was aware, through his experience, that drug traffickers often use rental vehicles or third-party vehicles. See United States v. Williams, 271 F.3d 1262, 1270 (10th Cir. 2001) (listing cases recognizing that drug couriers often use third-party rental vehicles).

In addition, Ms. Contreras detailed travel plans that Sgt. Bauer found implausible. Contreras told Sgt. Bauer that she had left Nebraska "about Thursday"[5] and had arrived in Las Vegas sometime Saturday morning, October 2.[6] Contreras told Bauer that she had gone to Las

---

[5] The rental agreement indicates that the car was rented out of Bellvue, Nebraska on Thursday, September 30, 2004. (Tr. at 20.)

[6] Defense counsel claims there is no evidence in the record that Contreras told Sgt. Bauer that she had arrived in Las Vegas that morning. The court disagrees. At the evidentiary hearing, Sergeant Bauer testified unequivocally that Ms. Contreras told him "that she arrived in Las Vegas that morning." (Tr. at 17.) Having carefully scrutinized the videotape of the incident, the court is aware that the videotape contains numerous portions of inaudible dialogue. Given that Sergeant Bauer was present and a party to the conversation as it transpired, and because the court finds no reason to question the credibility of Sergeant Bauer, the court accepts Sergeant Bauer's testimony.

13

Vegas to visit relatives there, including one family member who had come up from Mexico.[7] Sgt. Bauer found Contreras' travel plans highly irregular and implausible. At the time of the stop, Contreras was traveling through Beaver County, Utah, which is approximately 3 hours driving distance from Las Vegas. In order for Contreras to have been in Beaver at 1:00 p.m., Contreras would have had to depart Las Vegas at approximately 10:00 a.m. Thus, according to Contreras' version of events, she had traveled all the way from Nebraska to visit relatives and had stayed only a few hours before beginning her return home. The Tenth Circuit has repeatedly held that implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity. See United States v. Kopp, 45 F.3d 1450, 1453-54 (10th Cir.) ("Defendant's explanation of his travel plan and purpose was not plausible," where defendant said he was driving from California to North Carolina to take a "very dilapidated sofa to some friends" and

---

[7]Defense counsel claims that Ms. Contreras never indicated that a relative was coming from Mexico, and asserts that the videotape "clearly indicates that Ms. Contreras said 'The other one lives in New Mexico.'" See Def's Mem. In Support of Motion to Suppress at 15 & n.1. The court disagrees. First, the court's independent and careful review of the videotape indicates that when asked, "where do they live at," Contreras replied, "one of them lives in Vegas. The other one lives in, um [long pause], Mexico." (Govt's Ex. 1.) Second, the court's finding on this point is supported by the transcript of the audio portion of the videotape which defense counsel procured and then submitted as Defendant's Ex. A. Defendant's Exhibit A details the dialogue as follows:

> OFFICER: Where do they live at.
> MS. CONTRERAS: One of them lives in Vegas. The other one lives in Mexico.
> OFFICER: Oh.
> MS. CONTRERAS: And he was going to come over and visit the one in Vegas.
> OFFICER: I see.
> MS. CONTRERAS: And so I wanted to visit them.

Def's Ex. A at 3. Finally, Sergeant Bauer's testimony on this point was consistent with both the court's independent review of the videotape as well as the defendant's transcript of the audio portion of the video. (Tr. at 17.)

14

he was vague about his actual destination); United States v. Sanchez-Valderuten, 11 F.3d 985, 989 (10th Cir. 1993) (finding reasonable suspicion in part because of defendant's "unlikely" route, where defendant claimed to be going to New York but said he was moving his family to the state of Washington). This court is of the opinion that the facts of this case present similarly implausible plans.

Sergeant Bauer testified that given his training and experience, all of the factors listed above were indicators of drug trafficking and caused him to have a reasonable suspicion that Contreras was involved in drug trafficking. In light of the totality of the circumstances and Sgt. Bauer's training and experience, the court concludes that Sgt. Bauer's suspicion was reasonable. Accordingly, it was lawful for Sergeant Bauer to detain Contreras and ask for permission to search the trunk of the vehicle.

### III.  Consent to Search the Trunk

Having determined that Sgt. Bauer's continued detention and request for access to the trunk of the car was lawful, the court must next determine whether Ms. Contreras freely and voluntarily consented to the request. See Bumper v. North Carolina, 391 U.S. 543 (1968). The government bears the burden of proof on this issue. United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993); see Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). The court determines whether a consent was voluntary after evaluating the totality of the circumstances. United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994).

As a general rule, the Tenth Circuit has found consent to be voluntary when there is no evidence of coercion and the testimony establishes that consent was freely given. See Soto, 988 F.2d at 1558. Additionally, a person who is being detained may still give a voluntary consent.

United States v. Flores, 48 F.3d 467, 469 (10th Cir.), cert. denied, 516 U.S. 839 (1995).

In United States v. Soto, the Tenth Circuit found the following factors relevant in determining whether a defendant's consent was voluntary.

> It appears [the officer] did not unholster his weapon, did not use an insisting tone or manner, did not physically harass defendant, and no other officers were present. Further the incident occurred on the shoulder of an interstate highway, in public view. [The officer] sought permission specifically to look in the trunk, and defendant got out of the car and opened the trunk himself. The defendant makes no contention that he misunderstood the officer's request; any such claim is precluded by defendant's act of opening the trunk. Thus, defendant's consent was unequivocal and specific.

Soto, 988 F.2d at 1558. Similar to the facts in Soto, the facts of this case reveal that Sgt. Bauer did not coerce Contreras into consenting to a search of the trunk. At the time the request was made, Sgt. Bauer had returned Contreras' documents and was standing outside the passenger door of the rental car. The videotape establishes that Sgt. Bauer used a polite tone of voice in speaking to Contreras and made no threats. Sgt. Bauer did not touch Contreras or draw his weapon. Additionally, the stop was on a public highway, during daylight hours, and Bauer was the only law enforcement officer at the scene. Based on the totality of those facts, the court concludes that Contreras voluntarily consented to a search of the trunk.

Defendant asserts, however, that Sergeant Bauer exceeded the scope of Ms. Contreras' consent when he did more than merely "look" inside the trunk. It is well established that "the scope of a search is . . . limited by the breadth of the consent given." United States v. Elliott, 107 F.3d 810, 814-15 (10th Cir. 1997) (citations omitted). The court applies an "objective reasonableness" standard to the scope of consent: "what would the typical reasonable person have understood by the exchange between the officer and the suspect." United States v. Gigley, 213 F.3d 509, 514 (10th Cir. 2000). The court must consider the totality of the circumstances

16

when determining whether a search was within the scope of consent. <u>United States v. Gutierrez-Hermosillio</u>, 142 F.3d 1225, 1231 (10th Cir.), <u>cert. denied</u>, 525 U.S. 900 (1998).

Applying these principles to the facts of this case, the court concludes that Sergeant Bauer's search did not exceed the scope of Ms. Contreras' consent when he searched the trunk and observed the spare tire. By agreeing to open the trunk and let Sergeant Bauer look inside, Contreras authorized Bauer to do more than just peer into the trunk. <u>See</u> <u>United States v. Gigley</u>, 213 F.3d 509, 515 (10th Cir. 2000). The Tenth Circuit has repeatedly held that similarly phrased requests amounted to requests for a full search of the premises. <u>Gigley</u>, 213 F.3d at 515 (finding that driver's agreement to let officer "look in" van authorized full search of vehicle); <u>United States v. Anderson</u>, 114 F.3d 1059, 1065 (10th Cir. 1997) (holding that by giving officer consent to "scout around" his vehicle, defendant authorized a full search of it, including underneath and around it); <u>United States v. McRae</u>, 81 F.3d 1528, 1537-38 (10th Cir. 1996) (concluding that defendant's consent to officer's request to "look in" his car gave the officer authorization to search the car, including lifting up carpeting in the trunk of the car); <u>United States v. Pena</u>, 920 F.2d 1509, 1514 (10th Cir. 1990) (finding that consent to "look in" car allowed the officer to remove door panels); <u>United States v. Espinoza</u>, 782 F.2d 888, 892 (10th Cir. 1986) (finding that request to "look through" defendant's car authorized a thorough search).[8]

Having concluded that Contreras authorized Sergeant Bauer to search the trunk, it was not necessary for Sergeant Bauer to ask for specific permission to look at the tire more closely.

---

[8] Defendant's reliance on <u>United States v. Wald</u>, 216 F.3d 1222 (10th Cir. 2000), is misplaced. In <u>Wald</u>, the court upheld the district court's finding that the defendant's consent to the officer's request to take a "quick look" was limited to the interior of the vehicle and did not extend to a search of the trunk." <u>Id.</u> at 1228. Unlike <u>Wald</u>, in the case at bar, the officer's request was specifically directed to looking in the trunk.

17

Nonetheless, the videotape reveals that Sergeant Bauer returned to Ms. Contreras on two separate occasions to inform Contreras of what he was doing and what he had found. During those two visits, he received her specific permission to take the tire out and examine it more carefully.

After examining the tire more carefully, considering his training and experience, and in light of the totality of the circumstances that had unfolded, the court concludes that Sergeant Bauer developed probable cause to believe the tire contained contraband. See United States v. Strickland, 902 F.2d 937, 942-43 (11th Cir. 1990) (finding probable cause to search oversize, incongruous spare tire). Under the automobile exception to the warrant requirement, therefore, he was entitled to seize the tire and search it more thoroughly.

Therefore, based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that defendant's motion to suppress is DENIED.

DATED this 1st day of March, 2006

BY THE COURT:

_David K. Winder_
David K. Winder
Senior District Court Judge